1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4    DR. MARK A. BARRY,                )
                                       )
5                      Plaintiff,      )
                                       ) C.A. No. 20-1787-RGA
6    v.                                )
                                       ) CONSOLIDATED
7    STRYKER CORPORATION,              )
                                       )
8                      Defendant.      )

9
                                    J. Caleb Boggs Courthouse
10                                  844 North King Street
                                    Wilmington, Delaware
11
                                    Thursday, July 21, 2022
12                                  2:00 p.m.
                                    Discovery Dispute Conference
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16            HEYMAN ENERIO GATTUSO & HIRZEL LLP
              BY:  GILLIAN L. ANDREWS, ESQUIRE
17
                        -and-
18
              KILPATRICK TOWNSEND & STOCKTON LLP
19            BY:  DARIO A. MACHLEIDT, ESQUIRE
              BY:  KATHLEEN R. GEYER, ESQUIRE
20
                             For the Plaintiff
21

22

23

24

25

1    APPEARANCES CONTINUED:

2              MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  BRIAN P. EGAN, ESQUIRE
3
                        -and-
4
               KUTAK ROCK LLP
5              BY:  CHAD T. NITTA, ESQUIRE

6                              For the Defendant

02:00:09  7    ***  PROCEEDINGS  ***

02:00:09  8         DEPUTY CLERK:  All rise.  Court is now in

02:00:16  9    session.  The Honorable Richard G. Andrews presiding.

02:00:17 10         THE COURT:  All right.  Good afternoon, and

02:00:18 11    please be seated.  So, this is *Dr. Mark Barry vs. Stryker*

02:00:29 12    *Corporation,* Civil Action Number 20-1787.

02:00:33 13         And I guess Plaintiff is represented by an

02:00:40 14    attorney who was once mistaken for being related to me.

02:00:46 15         MS. ANDREWS:  Good afternoon, Your Honor.

02:00:47 16         THE COURT:  Maybe more than once.  So, who have

02:00:49 17    you got with you, Ms. Andrews?

02:00:51 18         MS. ANDREWS:  Yes, Your Honor.  Thank you.

02:00:54 19    Gillian Andrews from Heyman Enerio Gattuso & Hirzel on

02:00:57 20    behalf of Defendant -- excuse me, Plaintiff, Dr. Barry.  And

02:01:00 21    I rise this afternoon to introduce my colleagues from

02:01:03 22    KilPatrick Townsend & Stockton, Dario Machleidt and Kate

02:01:09 23    Geyer, both of whom have been admitted pro hac vice in this

02:01:12 24    case.

02:01:13 25         And with the Court's indulgence, Mr. Machleidt

1  will be making the presentation this afternoon for the

2  Plaintiff.

3         THE COURT:  Okay.  Thank you.

4         MS. ANDREWS:  Thank you.

5         THE COURT:  And Mr. Egan, who has never been

6  mistaken for being related to me.

7         MR. EGAN:  Good afternoon, Your Honor.  Brian

8  Egan from Morris Nichols on behalf of the SeaSpine

9  Defendants.  Joining me today at counsel table is Chad Nitta

10  from the Kutak Rock law firm.

11         THE COURT:  All right.  Well, thank you.  And

12  so, good afternoon to all the attorneys from out of town.

13  Well, good afternoon to everyone.

14         So, I did read the letters, and I have with me a

15  copy of the interrogatories which were, or at least

16  Interrogatories Number 1 through 5, which were submitted

17  with somebody's pleading letter.  And so, I think I

18  generally understand what the main argument is, which is I

19  would say that the Plaintiff wants discovery on products it

20  hasn't accused of infringement.

21         Is that what the issue is?

22         MR. MACHLEIDT:  Your Honor, that is one of the

23  issues.  Correct.

24         THE COURT:  All right.  Well, why don't you talk

25  about that issue because that seemed like the main issue.

02:02:39  1          MR. MACHLEIDT:  May I approach?

02:02:40  2          THE COURT:  Sure.

02:02:40  3          MR. MACHLEIDT:  Your Honor, there are a few

02:02:45  4  documents I may use on the projector.  May I approach and

02:02:49  5  hand up some copies?

02:02:50  6          THE COURT:  Okay.

02:02:58  7          MR. MACHLEIDT:  Good afternoon, Your Honor.

02:03:07  8  Dario Machleidt on behalf of Dr. Barry.  This dispute has

02:03:10  9  two parts, and I think you touched on both of them.

02:03:12 10          The first is that Dr. Barry's entitled to

02:03:16 11  discovery beyond just the Daytona system.  We're entitled to

02:03:23 12  derotation information from SeaSpine, and I'll begin with

02:03:26 13  that issue first.

02:03:32 14          The images that you see here come from the

02:03:36 15  Daytona Surgical Technique Guide.  That is their instruction

02:03:39 16  manual.  That is the SeaSpine manual.  And the manual for

02:03:43 17  Daytona explains that it can be used for segmental and en

02:03:50 18  bloc derotation.

02:03:50 19          You see segmental at the top.  That just means

02:03:53 20  that you rotate individual vertebra one at a time.  That is

02:03:58 21  the prior art.  En block is on the bottom, and en block

02:04:02 22  involves linking the construct along the spine and sometimes

02:04:06 23  across the spine such that when you move the vertebrae, they

02:04:09 24  move at the same time.  You move multiple at the same time.

02:04:14 25  Dr. Barry's patents cover different methods and systems of

02:04:18  1    en bloc derotation.

02:04:19  2         According to SeaSpine, we only get discovery on

02:04:23  3    Daytona because that is what Dr. Barry has accused of

02:04:27  4    infringement.  Specifically, if there's another system out

02:04:30  5    there by SeaSpine that is capable of what you see here, but

02:04:34  6    they intend that it is only used for the segmental

02:04:39  7    surgeries, we don't get discovery on that because segmental

02:04:42  8    to them is irrelevant because it is not infringing.

02:04:45  9         And I have two issues with their intent

02:04:48 10    argument, and I think that gets to the heart of the matter.

02:04:51 11    And the first is that this is an inducement case.  Intent is

02:04:54 12    an issue of fact for the jury.  They cannot decide an issue

02:04:58 13    of fact on their own and in their favor to withhold

02:05:02 14    discovery.

02:05:04 15         If there is some other system out there that is

02:05:07 16    capable of what you see here, yet they intend for it only to

02:05:11 17    be used for what we see at the top and not the bottom,

02:05:15 18    that's an issue on the merits for trial.  They can try to

02:05:18 19    argue why they're not inducing infringement.

02:05:20 20         THE COURT:  But this is for some system other

02:05:22 21    than the Daytona system?

02:05:24 22         MR. MACHLEIDT:  Presumably.  I don't even know

02:05:26 23    if that's the case because they refused to even answer

02:05:30 24    Interrogatory Number 1 when I asked them to identify what

02:05:33 25    derotation systems do you --

02:05:35  1          THE COURT:  Well, no, no, no.  You accused the

02:05:38  2   Daytona system of being, I don't know, a device for which

02:05:41  3   your patents are infringed; right?

02:05:43  4          MR. MACHLEIDT:  Correct.

02:05:44  5          THE COURT:  And so, presumably to the extent you

02:05:46  6   asked for discovery in connection with the Daytona system,

02:05:53  7   there may be other objections, but one of the objections is

02:05:59  8   not you haven't accused our product; right?

02:06:02  9          MR. MACHLEIDT:  With respect to Daytona, that is

02:06:04 10   correct.

02:06:04 11          THE COURT:  Okay.  So, you're going to get

02:06:08 12   whatever it is you need about Daytona through whatever

02:06:13 13   discovery you're doing; right?

02:06:15 14          MR. MACHLEIDT:  I hope so.

02:06:15 15          THE COURT:  Okay.  So, we're talking about

02:06:17 16   something else besides Daytona here?

02:06:21 17          MR. MACHLEIDT:  I believe so.  And the only

02:06:23 18   reason I can say I believe so is because they have staunchly

02:06:27 19   refused to tell me even if there is anything else.  And the

02:06:30 20   reason I believe I'm entitled to information about other

02:06:34 21   derotation systems is because of this Court's Invensas

02:06:39 22   framework.  I don't believe I'm saying that case right, but

02:06:42 23   it's the Judge Burke framework where you have to analyze

02:06:45 24   relevance, whether the information is publicly available,

02:06:48 25   and then, of course, undue burden.

02:06:49  1          And I'll begin with the public availability

02:06:53  2     issue because I think a lot of cases they focus on say the

02:06:57  3     Plaintiff dropped the ball.  The Plaintiff should have gone

02:06:59  4     out and bought these other unaccused products, done the tear

02:07:03  5     down, done the analysis, and then decided to include them in

02:07:06  6     the case or not.

02:07:07  7          These derotation systems are not publicly

02:07:10  8     available.  Companies like SeaSpine loan these out to

02:07:14  9     hospitals, and then they are returned once a surgery is

02:07:18 10     finished.  They are not sold into commerce.  Dr. Barry has

02:07:21 11     filed quite a few of these cases, and I have represented him

02:07:24 12     in all of them.  Not once have we been able to go out and

02:07:27 13     buy one of these derotation systems.  So, they're not

02:07:31 14     publicly available.  The --

02:07:33 15          THE COURT:  But they're widely known in the

02:07:35 16     medical community, aren't they?

02:07:37 17          MR. MACHLEIDT:  The fact that they exist is

02:07:39 18     known.

02:07:40 19          THE COURT:  Well, so what does SeaSpine make

02:07:43 20     that exists besides the Daytona?

02:07:45 21          MR. MACHLEIDT:  In terms of derotation systems?

02:07:48 22          THE COURT:  Sure.  That's what we're talking

02:07:50 23     about, I guess.

02:07:51 24          MR. MACHLEIDT:  In terms of what I'm aware of,

02:07:53 25     in terms of public information about other derotation

02:07:56 1    systems, there's nothing I'm aware of which is why we asked

02:08:00 2    the question in Interrogatory Number 1 to confirm:  Is there

02:08:04 3    anything else there?  In our briefing, we brought up the

02:08:07 4    Medtronic action and the Globus action.  Those are two prior

02:08:11 5    Dr. Barry cases where, despite extensive efforts on our part

02:08:15 6    to find out what was available in the public, we still

02:08:19 7    learned at the very end of discovery in both of those cases

02:08:23 8    that there were other derotation systems that those

02:08:26 9    companies were providing that there was no public record of

02:08:29 10   at all.  And we wanted to get ahead --

02:08:32 11           THE COURT:  But Dr. Barry, he's in this field.

02:08:36 12   Presumably, he participates in medical societies and things

02:08:41 13   of like-minded surgeons who would be aware of what's out

02:08:46 14   there.

02:08:48 15           Doesn't he?

02:08:48 16           MR. MACHLEIDT:  To some extent, yes.  And in the

02:08:51 17   prior cases, we even commissioned surveys of a

02:08:55 18   representative group of surgeons to find out what they knew

02:08:59 19   and what systems they were using.  But at the end of the

02:09:02 20   day, I bring up the Medtronic and Globus examples.  There

02:09:05 21   are still systems that an individual surgeon does not know

02:09:08 22   about.

02:09:09 23           Now, Dr. Barry is retired, but for example, we

02:09:12 24   have an expert witness we have used in our past cases who is

02:09:16 25   a surgeon.  He has a certain amount of information about

02:09:19 1  what is available, but it is limited.  He does not know --

02:09:22 2  with his hospital, they use, DePuy, a Johnson & Johnson

02:09:27 3  subsidiary.  So, he knows very well that Johnson & Johnson

02:09:31 4  product offerings and a few others when sales reps approach

02:09:34 5  him and try to get him to switch, you know, what he's doing.

02:09:37 6  But he doesn't know everything which is why we had to go the

02:09:40 7  survey route.

02:09:40 8         We've done two surveys, and what I know after

02:09:43 9  all of this research and talking to surgeons is that

02:09:47 10 SeaSpine provides the Daytona system.  And I simply wanted

02:09:51 11 to know with Interrogatory Number 1, is that it, or are we

02:09:55 12 going to face another Medtronic example or another Globus

02:09:58 13 example?  And under the Invensas framework, that non-public

02:10:03 14 nature of these systems, I feel that has been established or

02:10:06 15 I believe we've established it.

02:10:08 16        And to be clear, even the information that we

02:10:11 17 have in the Complaint is slowly disappearing from the public

02:10:14 18 record.  Daytona, what -- the system you see here on the

02:10:18 19 screen, when I go to SeaSpine.com, it is no longer there.

02:10:23 20 There's a video in our Complaint that walks through the use

02:10:26 21 of the Daytona system.  It is no longer publicly available.

02:10:30 22 They produced it as part of their core technical production,

02:10:33 23 and they put a confidential Bates stamp on it.

02:10:36 24        So, these systems are not public.  We have done

02:10:39 25 everything that, under Invensas, we can be expected to do to

02:10:42 1    see if there's something else.  And now, we are resorting to

02:10:45 2    the discovery vehicle to see if there is something else out

02:10:49 3    there that is capable.  And by "out there," I mean within

02:10:52 4    SeaSpine, another derotation system that is capable of what

02:10:55 5    you see here.

02:10:57 6          Tell us.  And if it is capable of what you see

02:10:59 7    here, it doesn't matter how you intend it to be used.

02:11:03 8          THE COURT:  Okay.  I get your point.

02:11:05 9          All right.  On this point, is there anything

02:11:07 10   more you want to say?

02:11:08 11         MR. MACHLEIDT:  Yes, Your Honor.  One last

02:11:10 12   thing, because they raised the notion of undue burden, there

02:11:14 13   is, in my view, an unlikely chance that there's actually

02:11:18 14   undue burden for them to answer our requests, to provide us

02:11:22 15   the requested information.  I don't know the details of

02:11:25 16   SeaSpine, but I do know Stryker.

02:11:28 17         That is their co-Defendant who is ten times

02:11:31 18   larger than SeaSpine.  It has three derotation systems.  I

02:11:35 19   would be surprised if SeaSpine, at one-tenth the size of

02:11:40 20   Stryker, has that much more in terms of derotation systems

02:11:43 21   than Stryker.  It's much larger.

02:11:46 22         THE COURT:  So, I'm sorry.  You said something

02:11:48 23   that has jogged me.  So, I had been thinking, I had not

02:11:54 24   really noticed the party that -- so, Stryker, even though

02:11:56 25   they're in the caption of the case, that's because it's

02:11:59  1    consolidated.

02:12:01  2                    Actually, this thing, right, what we're doing

02:12:03  3    right now, is nothing to do with Stryker?

02:12:04  4                    MR. MACHLEIDT:  That is correct, Your Honor.

02:12:06  5    I'm glad I said what I did.  That is correct.  There is no

02:12:09  6    discovery fight today with Stryker.

02:12:11  7                    They answered our interrogatories.  They've

02:12:13  8    provided the information, but --

02:12:14  9                    THE COURT:  Yeah.  No, no.  I just -- you know,

02:12:19 10    it may not actually make any difference, but I did not -- I

02:12:22 11    thought SeaSpine was -- it doesn't matter, but thank you for

02:12:27 12    that.  That's helpful.  That's important that I keep these

02:12:30 13    things straight.

02:12:31 14                    MR. MACHLEIDT:  Of course, Your Honor.

02:12:32 15                    THE COURT:  Okay.  So, you were saying, okay,

02:12:34 16    SeaSpine is one-tenth the size of Stryker.  I certainly had

02:12:38 17    Stryker appearing in other cases over the years.  I don't

02:12:41 18    think I've ever heard SeaSpine other than in this case.

02:12:44 19                    But so, they're one-tenth the size.  And so?

02:12:48 20                    MR. MACHLEIDT:  That goes to their undue burden

02:12:50 21    argument.  And I have a clip or a snippet from their

02:12:52 22    briefing here on the projector, and --

02:12:55 23                    THE COURT:  Right.  So, I'm not worried about

02:12:58 24    undue burden.  I'm not worried about it.

02:13:04 25                    So, is there anything else you want to say about

02:13:12 1    this particular part of your dispute?

02:13:13 2            MR. MACHLEIDT:  No, Your Honor.  I appreciate

02:13:14 3    you hearing me out.

02:13:16 4            THE COURT:  Okay.  So, can I hear from, I guess,

02:13:22 5    Mr. Nitta on this?

02:13:32 6            So, Mr. Nitta, I guess one of the things that

02:13:35 7    I'm curious about, and it seems to be part of what -- sorry,

02:13:43 8    is it Mr. Machleidt?

02:13:45 9            MR. MACHLEIDT:  Machleidt, Your Honor.

02:13:48 10           THE COURT:  Okay.  Sorry about that.

02:13:49 11           MR. MACHLEIDT:  No problem.

02:13:50 12           THE COURT:  Is how do people, hospitals, how do

02:13:57 13   they know what your products are?

02:14:02 14           MR. NITTA:  Your Honor, they -- we had a series

02:14:07 15   of effectively reseller agents who work with hospitals and

02:14:13 16   provide information about hospitals, about our products and

02:14:16 17   help sell them.

02:14:17 18           THE COURT:  Well, so the reseller agents, how do

02:14:20 19   they learn what your products actually are?

02:14:22 20           MR. NITTA:  There's information that we provide

02:14:25 21   to the resellers.  They get a training in order to

02:14:29 22   understand the products.

02:14:30 23           THE COURT:  And so, I'm going to ask you a

02:14:38 24   question.  How many different products does SeaSpine

02:14:40 25   currently sell?

02:14:41 1          MR. NITTA:  Your Honor, with respect to the

02:14:46 2  total number of products or with respect to derotation?

02:14:50 3          THE COURT:  Everything.

02:14:50 4          MR. NITTA:  I actually don't have the number

02:14:52 5  of -- the total number of products.  It's more than a dozen

02:14:55 6  product lines.  SeaSpine's primary business is making spinal

02:14:59 7  implants, and so, basically, the screws that go into the

02:15:04 8  spine.  They're --

02:15:05 9          THE COURT:  Okay.

02:15:05 10          MR. NITTA:  And so, they have various types of

02:15:07 11  those that are not part of this case?

02:15:09 12          THE COURT:  So, I don't think we're interested

02:15:10 13  in screws right now, though I asked the question, so I'm not

02:15:14 14  being critical.  So, the dozen product lines, is one of the

02:15:18 15  product lines Daytona?

02:15:25 16          MR. NITTA:  Yes, Your Honor.

02:15:26 17          THE COURT:  All right.  And does the Daytona

02:15:31 18  product line include anything other than Daytona?

02:15:34 19          MR. NITTA:  The reason I hesitate, Your Honor,

02:15:39 20  is that the Daytona system includes both tools and implants.

02:15:44 21  And so, there are various components within the system that

02:15:47 22  are all part of the Daytona system.  I'm not sure I'm

02:15:51 23  answering your question.  There's not another system.

02:15:53 24          THE COURT:  But everything that's sold in this

02:15:55 25  product line, this Daytona, is Daytona related?

02:15:59 1          MR. NITTA:  Yes.  Daytona system is a thing and
02:16:01 2     it's an umbrella.  Everything within that is Daytona.
02:16:04 3          THE COURT:  And if you were describing the
02:16:07 4     Daytona product line in a sentence for a lay audience, what
02:16:11 5     would you say it is?
02:16:13 6          MR. NITTA:  Your Honor, I would say the Daytona
02:16:16 7     system is intended for spinal derotation.
02:16:20 8          THE COURT:  Okay.  So, it's a system for spinal
02:16:22 9     derotation?
02:16:23 10          MR. NITTA:  Yes.  That's how I would
02:16:24 11     characterize it, Your Honor.  I can't swear to you that's
02:16:26 12     what our technical guide would say.
02:16:29 13          THE COURT:  Do you sell any other product lines
02:16:41 14     for spinal derotation?
02:16:44 15          MR. NITTA:  Your Honor, at present SeaSpine has
02:16:50 16     one other system that is in a -- it's in a testing phase, so
02:16:59 17     there's been a limited release.  And so, I don't think we
02:17:03 18     sell it yet.  If the question is:  Do we sell any other
02:17:06 19     systems, the answer is no.  But I do believe there is a
02:17:09 20     system that has been launched.  And they don't use the term
02:17:13 21     beta, but I think it is a beta launch.
02:17:15 22          THE COURT:  And I don't know how deep your
02:17:18 23     experience in this industry goes, but how long does it take
02:17:21 24     from, let's call it, beta to the thing is ready for market,
02:17:26 25     if all goes according to plan?

02:17:28  1                    MR. NITTA:  That I can't answer, Your Honor.  I

02:17:30  2      don't know if that's months or years.  I assume it's months,

02:17:33  3      but I don't know the exact timeline.

02:17:35  4                    THE COURT:  Okay.  And so, there's a product

02:17:42  5      line that's under development.  Does that actually have a --

02:17:49  6      is the name of that a top secret kind of thing right now?

02:17:52  7                    MR. NITTA:  No, Your Honor.  I believe it's

02:17:54  8      publicly been announced and information is available.

02:17:56  9                    THE COURT:  So, what is the name of it?

02:17:58 10                    MR. NITTA:  It's called Mariner Adult

02:18:02 11      Abnormality.

02:18:02 12                    THE COURT:  Mariner like the seafarer?

02:18:03 13                    MR. NITTA:  Yes, Mariner Adult Abnormality.  I

02:18:09 14      think the last word is abnormality.  I'll double-check, Your

02:18:12 15      Honor.  It could be adult deformity.

02:18:14 16                    THE COURT:  All right.  And so, you've got the

02:18:16 17      Daytona product line.  You've got the Mariner Adult

02:18:21 18      Abnormality, which is in the development phase, and it has

02:18:26 19      some public release.

02:18:30 20                    Is there anything else, any other product lines

02:18:34 21      that are either spinal derotation or spinal en block?

02:18:40 22                    MR. NITTA:  No.  Your Honor, and just so that I

02:18:45 23      can clarify, Your Honor, part of the reason that SeaSpine is

02:18:48 24      here and having the hearing with us is that, from our

02:18:50 25      perspective and from the plain words of discovery, they are

02:18:53  1    not limited to spinal derotation systems.  And that's been

02:18:56  2    the crux of our objection to the scope of what's being

02:19:00  3    sought.  Notwithstanding what Mr. Machleidt had said about

02:19:03  4    seeking derotation information, the definition in the RFPs

02:19:08  5    goes far beyond derotation systems.  And that's been the

02:19:11  6    nature of our concern, that we don't believe we should be

02:19:15  7    required to produce voluminous information about products

02:19:18  8    that are not derotation systems.

02:19:20  9         And so, to be specific, Your Honor, the

02:19:22  10    definition that was used in the discovery had to do with

02:19:25  11    products that are capable of, I believe -- apologies.  I can

02:19:32  12    say it is using a medical procedure to correct a spinal

02:19:40  13    deformity condition.  And, Your Honor, for us, with respect

02:19:43  14    to our implants and other things, which are not accused, we

02:19:48  15    were of the mind that they are used to potentially correct a

02:19:53  16    spinal deformity condition.  So, we had a concern about

02:19:56  17    going beyond derotation, Your Honor.

02:19:58  18         And then, secondly, Your Honor, when we talk

02:20:00  19    about capable of, I certainly understand Mr. Machleidt's

02:20:03  20    point of if we were differentiating saying that something

02:20:07  21    could only be used for segmental derotation and try to

02:20:11  22    exclude that, I understand that concern, Your Honor.  Our

02:20:13  23    concern, though, when we talk about something that's being

02:20:15  24    capable of being used of, that would expand to things that

02:20:18  25    are being misused, and including if you used our product to

02:20:21  1    do a derotation.

02:20:23  2                THE COURT:  Well, so let me just go back to

02:20:25  3    these dozen product lines.  Are any of these product -- the

02:20:29  4    existence of any of these product lines a secret?

02:20:35  5                MR. NITTA:  Not that I know of, Your Honor.

02:20:37  6    They're certainly not the ones that I'm thinking about.  I

02:20:39  7    can't tell you whether or not SeaSpine has secret products.

02:20:41  8    I'm not aware of any.  So, no.  I think they're on their

02:20:45  9    website and other places.  We can find information about

02:20:47 10    that -- types of implants.

02:20:48 11                THE COURT:  All right.  So, hold on a second,

02:20:52 12    Mr. Nitta, and let me just ask Mr. Machleidt.

02:20:56 13                Did I get it that time?

02:20:57 14                MR. MACHLEIDT:  You did.  Thank you, Your Honor.

02:21:00 15                THE COURT:  Are you aware of this dozen product

02:21:03 16    lines?

02:21:04 17                MR. MACHLEIDT:  I'm aware of -- may I speak from

02:21:06 18    here, Your Honor?

02:21:07 19                THE COURT:  Yeah, yeah, yeah.

02:21:08 20                MR. MACHLEIDT:  I'm aware that they have quite a

02:21:10 21    few product lines.  I have analyzed their website, the

02:21:12 22    SeaSpine website quite a lot.  I have also seen Mariner come

02:21:16 23    up.  There is nothing that I have come across or any of my

02:21:20 24    experts have come across indicating that Mariner can be or

02:21:24 25    is a derotation system.

02:21:27  1          So, I'm aware of Mariner.  I'm aware of many of

02:21:31  2  their product lines.  I am not aware that there's any

02:21:33  3  connection between anything other than Daytona and

02:21:36  4  derotation.  And as of today, when I go on their website,

02:21:39  5  you mentioned -- you asked about secret products.  Daytona,

02:21:43  6  the images that we saw on the projector, that's not there on

02:21:46  7  the website anymore.  I don't know if they would call that

02:21:50  8  secret or not.

02:21:50  9          THE COURT:  Well, it's hard to be secret when it

02:21:58 10  was at one time on the website; right?

02:22:00 11          MR. MACHLEIDT:  That's true.

02:22:01 12          THE COURT:  Kind of like you file confidential

02:22:03 13  things in Court and they're made public, you can't make them

02:22:05 14  confidential again.

02:22:07 15          MR. NITTA:  And, Your Honor, if I may just

02:22:08 16  address that one.

02:22:09 17          THE COURT:  Well, before you do, let me just --

02:22:12 18  you had one last thought, I think?

02:22:14 19          MR. MACHLEIDT:  I agree with you, Your Honor.

02:22:16 20  You can't make them not confidential, but that is what

02:22:19 21  SeaSpine has done.  The video that we obtained publicly

02:22:22 22  about Daytona --

02:22:23 23          THE COURT:  Yeah, yeah.  I don't really care

02:22:24 24  about that.

02:22:25 25          All right.  Mr. Nitta, you had the floor.

|         |    |                                                                      |
|---------|----|----------------------------------------------------------------------|
| 02:22:29 | 1  | MR. NITTA:  Your Honor, I just wanted to address |
| 02:22:30 | 2  | the point about the website.  Your Honor, for -- at least in |
| 02:22:33 | 3  | terms of SeaSpine products, the Daytona product is |
| 02:22:37 | 4  | primarily -- it's my understanding it's used to treat |
| 02:22:40 | 5  | scoliosis. |
| 02:22:41 | 6  | THE COURT:  Yes. |
| 02:22:41 | 7  | MR. NITTA:  And scoliosis is typically in |
| 02:22:44 | 8  | children, and so that the primary usage has been Daytona |
| 02:22:49 | 9  | small stature, which is intended for children.  And that |
| 02:22:52 | 10 | information is still appearing on the website because that's |
| 02:22:54 | 11 | how our product has been used.  Your Honor, it has nothing |
| 02:22:57 | 12 | to do -- the removal information has nothing to do with this |
| 02:22:59 | 13 | lawsuit.  It's simply that its primary usage is to treat |
| 02:23:03 | 14 | children with scoliosis.  So, we emphasized Daytona small |
| 02:23:08 | 15 | stature. |
| 02:23:08 | 16 | THE COURT:  All right.  So, do you think, |
| 02:23:22 | 17 | Mr. Nitta, that if I directed you to answer an interrogatory |
| 02:23:26 | 18 | that had one sentence describing what each of the 12 product |
| 02:23:30 | 19 | lines is that that's something that could be done without |
| 02:23:35 | 20 | too much effort? |
| 02:23:36 | 21 | MR. NITTA:  The short answer, Your Honor, is |
| 02:23:41 | 22 | yes.  I don't know how much information we could pack into |
| 02:23:43 | 23 | one sentence.  But if you're asking us to make clear whether |
| 02:23:47 | 24 | they were a part of a derotation system or not, we could |
| 02:23:50 | 25 | certainly do that.  But if you're asking about information |

02:23:51 1   for their intended purpose --

02:23:52 2           THE COURT:  So, you know, my general view is I

02:23:57 3   don't really care what the intended purpose is.  As far as

02:24:02 4   I'm concerned at this point, there's only one accused

02:24:05 5   product.  And what I'm thinking is that because part of what

02:24:15 6   your opponent has been saying is they've been diligent at

02:24:20 7   looking around, and they can't find anything else.  Now,

02:24:24 8   maybe the most likely thing is they can't find anything else

02:24:27 9   because there isn't anything else, but I think it might help

02:24:32 10  prevent arguments down the road if you basically gave them

02:24:37 11  the names of the 12 product lines, and then they can go off

02:24:41 12  and do some research and see if there's anything else they

02:24:44 13  want to accuse.

02:24:45 14          You know, I don't think you should have to self

02:24:47 15  accuse your -- I don't think you should have to decide to

02:24:51 16  accuse yourself.  You know, your opponent cited Invensas,

02:24:58 17  which I don't know how to pronounce it, either.  You know,

02:25:03 18  going back, I think before that, there's a case by Judge

02:25:10 19  Jordan when he was a district judge, and it might even be

02:25:14 20  called Honeywell, but I could be wrong about that.  And, you

02:25:18 21  know, basically what I take out of it is is it's the

02:25:23 22  Plaintiff's job to name accused products and get discovery

02:25:26 23  on accused products.  It it's not an accused product, I'm

02:25:34 24  not going to be producing discovery on it, just as a general

02:25:38 25  matter, particularly.  So, the Plaintiff can figure out if

02:25:43 1    they want to make it an accused product.

02:25:46 2         I don't think -- I see very little to indicate

02:25:49 3    that it's actually -- you know, it's not as easy as going

02:25:55 4    and buying a Samsung electronic device, which you can buy in

02:26:01 5    any store.  Yeah, I get that.  But I think it's the

02:26:05 6    Plaintiff's job to come up with this.  And I sort of thought

02:26:10 7    that basically describing what the product lines are is --

02:26:17 8    when there's only 12 of them, would allow Plaintiff to at

02:26:21 9    least know whether or not they've looked all the places that

02:26:26 10   they want to look.

02:26:29 11        So, and I gather from what you're saying, and it

02:26:33 12   kind of makes sense because after all, you're busy trying to

02:26:36 13   sell these things to hospitals.  They can't be -- they can't

02:26:38 14   be secrets.  So, and when I say "product lines," I do really

02:26:46 15   mean things that are currently, you know, not the

02:26:50 16   developmental stage, but things that you're currently

02:26:53 17   actually selling, or getting rent on or however it is you

02:26:57 18   make money on the things that you're putting out there in

02:27:01 19   public.

02:27:02 20        So, I don't know which interrogatory -- so, I

02:27:06 21   would take that as a modified answer to Interrogatory Number

02:27:10 22   1.  And that's what I think I would like you to do is get

02:27:15 23   together with your people, identify your dozen or so product

02:27:18 24   lines.  And, you know, if Plaintiff wants to accuse new

02:27:23 25   products as a result of that, they can do so.  Then they can

02:27:26 1    get more discovery.

02:27:30 2            And if they choose not to do it, then you don't

02:27:33 3    have to produce discovery on making your own judgment about

02:27:38 4    what is or is not capable of derotation.

02:27:41 5            Okay?

02:27:42 6            MR. NITTA:  Yes, Your Honor.  Just so I

02:27:44 7    understand then, when they come back and tell us -- if

02:27:47 8    nothing else gets accused, we are fair to exclude the

02:27:50 9    products we list when we deal with discovery going forward?

02:27:53 10            THE COURT:  Right.  I mean, you know, it's hard

02:27:55 11    to say just universally, but if there's only one accused

02:27:59 12    product and that's the Daytona, then, you know, if you

02:28:06 13    say -- you know, other issues can come up.  But in terms of

02:28:11 14    what the accused product is, that's the focus of discovery,

02:28:14 15    and I guess that's the best I can do.  But they can't just

02:28:21 16    say, and, you know, we want you to produce information on

02:28:25 17    all these other products because, you know, maybe they could

02:28:29 18    be used in some way that infringes our patents.

02:28:34 19            MR. NITTA:  I understand, Your Honor.

02:28:34 20            THE COURT:  All right.  Do you think you can do

02:28:36 21    that within, say, two weeks?

02:28:38 22            MR. NITTA:  Yes, Your Honor.

02:28:39 23            THE COURT:  Okay.  All right.

02:28:41 24            So, Mr. Machleidt, what else is there for us to

02:28:47 25    resolve here?

02:28:49  1          MR. MACHLEIDT:  Your Honor, we still have to

02:28:51  2    talk about the interrogatory responses.

02:28:54  3          THE COURT:  Yes.  Okay.  Well, so, I'm glad you

02:28:59  4    brought that up because I thought, and Mr. Nitta, I don't

02:29:08  5    know whether you're responsible for this, but I thought your

02:29:11  6    objections, based on either counting or things that are

02:29:15  7    vague and ambiguous, was not even within the realm of

02:29:24  8    arguability, if you understand what I mean.  You know,

02:29:30  9    because it seemed like you had dropped a number of

02:29:34 10    interrogatories exceeding 25 in your reply letter.

02:29:38 11          But I made my own count of Interrogatories 1

02:29:43 12    through 4.  As a check, I asked my law clerk to make her own

02:29:48 13    count.  We came up close, and we didn't spend a lot of time

02:29:53 14    on this.  But whatever the count was, it was at most two

02:29:58 15    from Interrogatory Number 1, three for Interrogatory Number

02:30:01 16    2, and -- sorry.  Two for Interrogatory Number 2, three for

02:30:13 17    Interrogatory Number 3, and it was a little bit cloudier for

02:30:17 18    Interrogatory Number 4.

02:30:19 19          But it seemed to us -- it seemed to me that it

02:30:22 20    was somewhere in the range of about maybe three to five.

02:30:30 21    So, in any event, no reason not to answer all of them.  And

02:30:35 22    I don't really understand the vagueness objection.

02:30:40 23          So, what is left on these, Mr. Machleidt, to

02:30:45 24    argue about?

02:30:45 25          MR. MACHLEIDT:  Nothing, Your Honor.  You did

02:30:47  1    the argument for me.  The only thing I'd add is maybe a

02:30:50  2    footnote to it.  I believe they waived any, you know, sort

02:30:53  3    of discrete subpart objection they had by answering

02:30:57  4    Interrogatory Number 5, which, by their count, is Number 35,

02:31:01  5    and yet telling us that they could not respond to Numbers 2,

02:31:06  6    3 and 4 outright.

02:31:08  7              So, I take your point in terms of doing your own

02:31:11  8    count.  But I think in terms of SeaSpine, they should be at

02:31:14  9    five, and we can move on to other interrogatories after

02:31:18 10    this --

02:31:18 11              THE COURT:  All right.

02:31:19 12              MR. MACHLEIDT:  -- dispute.

02:31:20 13              THE COURT:  Well, I don't want to resolve this

02:31:22 14    right now because right now they're all in play.  And you

02:31:25 15    know, you all at some point -- they may be doing

02:31:29 16    interrogatories of you and sometimes context helps, but

02:31:33 17    right now saying -- and as I said in the letter, they gave

02:31:37 18    this up.

02:31:38 19              Mr. Nitta, do you have anything to say about

02:31:40 20    this?

02:31:41 21              MR. NITTA:  Your Honor, is it okay if I address

02:31:44 22    you from here?

02:31:44 23              THE COURT:  Yeah, sure.  Or actually, I think

02:31:46 24    Mr. Machleidt is through for the time being.  Why don't you

02:31:49 25    just come forward.

02:31:50  1          MR. NITTA:  Your Honor, as we indicate in the

02:31:54  2    letter, we were making objections simply to preserve.  And

02:31:57  3    you're right, we're not trying to stand on that objection.

02:32:00  4    But, Your Honor, our concern remains that each of the

02:32:02  5    interrogatories, at least 2, 3, and 4 rely on the definition

02:32:07  6    Defendants' products, which was the subject of what we've

02:32:09  7    been talking about.  Also, the subject of the RFP dispute.

02:32:13  8          THE COURT:  Right.  So, for right now,

02:32:15  9    "Defendant's products" is --

02:32:19 10          MR. NITTA:  Daytona.

02:32:20 11          THE COURT:  -- Daytona.  Thank you.

02:32:24 12          You know, if it turns out later on they accuse

02:32:27 13    more products, then there will be more products.  Right now

02:32:30 14    it's just Daytona.

02:32:31 15          MR. NITTA:  Thank you, Your Honor.  Then I don't

02:32:33 16    have any questions about the interrogatories.

02:32:35 17          THE COURT:  So, are you going to be owing them

02:32:38 18    some interrogatory responses based on this?

02:32:40 19          MR. NITTA:  Yes, Your Honor, and we will do

02:32:42 20    supplemental responses with the understanding that you've

02:32:44 21    just said that Defendant's products is, for these purposes,

02:32:47 22    the accused products.

02:32:48 23          THE COURT:  Okay.  And when will you do the

02:32:56 24    supplemental response?

02:32:58 25          MR. NITTA:  Your Honor, I only hesitate because

02:33:01 1    I have two trials in the next three weeks.  Could we do

02:33:05 2    21 days?

02:33:05 3                    THE COURT:  Mr. Machleidt.

02:33:11 4                    MR. MACHLEIDT:  These are four months old.  I'd

02:33:13 5    like them sooner.  If all -- the team is not just Mr. Nitta.

02:33:18 6    If they need to supplement down the road, they can, but

02:33:20 7    we've been waiting for a while.  I'd like --

02:33:22 8                    THE COURT:  Well, is there some deadline coming

02:33:24 9    up?  In other words, I prefer to just give him the 21 days

02:33:28 10   because he's asked for it.  Is this going to -- so, I

02:33:32 11   understand, you know, back and forth arguments, meet and

02:33:36 12   confers, go to the judge, it all takes time.

02:33:40 13                   Is there any particular prejudice to you if I

02:33:44 14   give them the 21 days he's asked for?

02:33:45 15                   MR. MACHLEIDT:  No, Your Honor.  We can live

02:33:47 16   with that.

02:33:47 17                   THE COURT:  Okay.  So, you've got 21 days,

02:33:49 18   Mr. Nitta.  Good luck with your trials.

02:33:50 19                   MR. NITTA:  Thank you, Your Honor.

02:33:52 20                   THE COURT:  All right.  So, does that resolve

02:33:54 21   the disputes, at least for today, on this?

02:33:56 22                   MR. MACHLEIDT:  I believe so.  Thank you, Your

02:33:57 23   Honor.

02:33:58 24                   THE COURT:  I guess if he's happy, you're happy.

02:34:02 25                   MR. NITTA:  Nothing from us, Your Honor.

02:34:03  1          THE COURT:  Okay.  All right.  Well, listen,

02:34:05  2     this seems like very interesting stuff, and I appreciate

02:34:09  3     your being here to help explain things to me.  And we've got

02:34:16  4     the dates.  The transcript of this will serve as an Order of

02:34:22  5     the Court, and I think it was straightforward enough that

02:34:27  6     probably it should not be able to be confused very easily.

02:34:30  7          Have a nice day.

02:34:31  8          MR. MACHLEIDT:  Thank you, Your Honor.

02:34:32  9          MR. NITTA:  Thank you, Your Honor.

02:34:32 10          (Everyone said, Thank you, Your Honor.)

02:34:34 11          DEPUTY CLERK:  All rise.

        12          (Court was recessed at 2:34 p.m.)

        13          I hereby certify the foregoing is a true and

        14     accurate transcript from my stenographic notes in the

        15     proceeding.

        16                    /s/ Heather M. Triozzi
                              Certified Merit and Real-Time Reporter
        17                    U.S. District Court

        18

        19

        20

        21

        22

        23

        24

        25